# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NORTHEASTERN DIVISION

JONATHON SCOTT BROWN, )
LEVI MULLINS, KEVIN HARRISON, )
LUCAS TRACY, TIMOTHY MANN, )
ROY GARDNER, WILLIAM ROWE, )
SHAWN FEINSTEIN, and JOHN )
DOE, )
                 )
        Plaintiffs, )
                 )
        v. )         **Docket No.: 2:21-cv-00009**
                 )
THE MACON COUNTY SHERIFF'S, )
DEPARTMENT d/b/a MACON )
COUNTY JAIL, SHERIFF MARK )
GAMMONS, SCOTTY SUTTON, )
JEFF WILSON, MACON COUNTY, )
KIM SUMMERS, and JOHN DOE, )
                 )
        Defendants. )
*************************************
BRANDON D. TAYLOR, CHESTER L. )
LOUDY, SCOTTIE GRIFFIN, CHAD )
REYNOLDS, JEFFREY T. FISHER, )
RANDALL D. GUFFEY, TYLER R. )
BERG and CALVIN O. TANKESLY )
                 )
        Plaintiffs, )
                 )
        v. )         **Docket No.: 2:21-cv-00040**
                 )
THE MACON COUNTY SHERIFF'S, )
DEPARTMENT d/b/a MACON )
COUNTY JAIL, SHERIFF MARK )
GAMMONS, SCOTTY SUTTON, )
JEFF WILSON, MACON COUNTY, )
and JOHN DOE, )
                 )
        Defendants. )

## MEMORANDUM OPINION

In this consolidated civil right actions brought by former inmates of the Macon County Jail in Lafayette, Tennessee, Defendant Kim Summers has filed a Motion for Summary Judgment (Doc. No. 117) and accompanying memorandum (Doc. No. 118), to which Plaintiffs have responded in opposition (Doc. No. 128) and Summers has replied (Doc. No. 129). The remaining Defendants have filed a separate Motion for Summary Judgment (Doc. No. 136) with accompanying memorandum (Doc. No. 137) to which Plaintiffs have also responded in opposition (Doc. No. 146) and Defendants have replied (Doc. No. 150). Also before the Court is Plaintiffs' Motion to Amend Case Management Order and Reconsider Motion to Amend (Doc. No. 167), to which Defendants have responded in opposition (Doc. No. 168).

For the reasons that follow, Summers' Motion for Summary Judgment will be granted while the other Motion for Summary Judgment will be granted in part and denied in part.[1] The Motion to Amend and Reconsider will be denied.

## I. Factual Background, Procedural Posture, And Standard Of Review

In support of the Motion for Summary Judgment, and in accordance with this Court's Local Rule 56.01, Defendants' filed a statement of undisputed facts (Doc. No. 138) , to which Plaintiff's responded in opposition (Doc. No. 147) ("SOF").[2] So far as material, those facts show the

---

[1] Because the Court can resolve the motions for summary judgment on the papers, Plaintiffs' Motion for Oral Argument (Doc. No. 155) will be denied.

[2] With respect to many of the introductory facts, Plaintiffs claim to be without specific knowledge of the fact asserted and so admits the same. Because those facts are supported by evidentiary material, the Court accepts them as true for summary judgment purposes.

Further, with respect to several facts, Plaintiffs simply cite deposition testimony, without page references. This does not comply with this Local Rule 56.01(c)(3) that requires: "Each disputed fact must be supported by specific citation to the record."

following.[3]

Sheriff Mark Gammons began noticing in 2012 that the jail was become fuller and nearing its capacity. To alleviate the problem, he and the County requested that the State of Tennessee accept inmates into the state prison system, and/or place Macon County inmates in other county jails. Gammons also requested a larger budget so that he could purchase more mats, clothing, and food for inmates, and increase the number of staff on each shift. Discussions were also had with the local judges and district attorney about the overcrowding issue. (SOF ¶¶ 1-4).

The efforts to reduce the number of inmates at the jail proved to be insufficient, and Macon Count was found by the State to be overcrowded and understaffed. This led to a Plan of Action instituted by the State. (Id. 5-6). As a part of the Plan, the County looked into expanding the present jail or constructing a larger facility. (Id. ¶ 6-7). In the interim, the County looked at stopgap measures to reduce overcrowding by: (1) refraining from executing probation violation warrants; (2) asking probation officers to stop violating a probationer unless it was absolutely necessary; and (3) looking into alternative rehabilitation programs for inmates. (Id. ¶¶ 9, 10, 12).

In April 2019, the County began reviewing sketches for expanding the jail. However, also during 2019, the jail inmate populations continued to increase monthly, prompting officials to hold "one or two inmates" in the multi-purpose room ("MPR") or isolation room on a temporary basis. (Id. ¶ 17). Towards the end of 2019, some inmates asked to stay in the MPR room, a practice approved by Gammons, so long as the inmates were given restroom breaks and provided shower time. (Id. ¶ 19).

---

[3] Summers, too, filed a statement of facts in support of her own motion, but there are only two such facts: she was employed as a corrections officer at the Macon County Jail and left the employ of Macon County on April 16, 2020. (Doc. No. 119 at 2). Plaintiffs do not dispute those facts.

3

Against this backdrop, Plaintiff Jonathan S. Brown, proceeding *pro se*, filed suit on February 26, 2021 against the Macon County Sheriff's Department alleging cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments. (Docket No. 2:21-cv-00009, Doc. No. 1). After initial screening by the Court, the Sheriff's Department was dismissed, but Plaintiff was allowed to amend his Complaint. (Id. Doc. No. 5). On May 7, 2021, an Amended Complaint was filed by counsel that added Levi Mullins, Kevin Harrison, Lucas Tracy, Timothy Mann, Roy Gardner, William Rowe and Shawn Feinstein as Plaintiffs. The Macon County Sheriff's Department d/b/a the Macon County Jail, Sheriff Mark Gammons, Scotty Sutton (Jail Administrator), Jeff Wilson (Assistant Jail Administrator), Kim Summers (Jailer), John Doe, and Macon County were named as Defendants. (Id. Doc. No. 12).[4]

The Amended Complaint sets forth three causes of action under 42 U.S.C. § 1983. Count I alleges "Deliberate Indifference to Serious Medical Needs Against the Correctional Officers of the Jail"; Count II alleges "Deliberate Indifference to Required Aspects of Inmate Dwelling"; and Count III alleges "Unconstitutional Conditions of Confinement." Count IV is as state law negligence claim brought against all Defendants.

That Amended Complaint (in what the Court will hereafter refer to as the "Brown case") is large on hyperbole but short on specific factual allegations, with broad brushes used to paint each individual's specific claims and the Defendants to whom the allegation is directed. One thing is clear, however. Plaintiffs in the Brown case complain about actions (or inactions) that occurred "specifically in and around January 2020 until late February 2020." Indeed, that exact phrase is used

---

[4] Other Defendants, such as the Commissioner of the Tennessee Department of Corrections and the Executive Director of the Tennessee Corrections Institute have since been dismissed by agreement of the parties. (Doc. No. 63).

when identifying each of the eight named Plaintiffs. (Am. Cmp. ¶¶ 1-8). The Amended Complaint also contains no other date in relation to Plaintiffs and their complaints about their incarceration in the Macon County Jail.

The Brown case was followed by what the Court will refer to as the "Taylor case" filed on October 6, 2021. (Doc. No. 2:21-cv-00040). There, Brandon D. Taylor, Chester L. Loudy, Scottie W. Griffin, Chad Reynolds, Jeffrey T. Fisher, Randall D. Guffey, Tyler R. Berg and Calvin O. Tankesly sued the same Defendants as in Brown. The Complaints in the two cases are substantially the same, including the hyperbole and lack of a link between a specific Defendant and the activities complained of. Likewise, the Taylor case advances the same four causes of action as in the Brown case. Conspicuously absent, however, is the repeated reference to "in and around January 2020 until February 2020." Instead, the dates in the Taylor case are linked to a specific Plaintiff and his period of incarceration. Thus, for example, the Complaint alleges that "Plaintiff Taylor was incarcerated at all times complained of herein, but more specifically in and around March 22, 2021 through May 6, 2021"; "Plaintiff Loudy was incarcerated at all times complained of herein, but more specifically in and around July 9, 2021 through July 13, 2021"; "Plaintiff Griffin was incarcerated at all times complained of herein, but more specifically in and around September 1, 2019 until late February 2020," and so on. (Doc. No. 2:21-cv-00040 at ¶¶ 2-4). Given these various dates, the phrase "all times complained of herein" is a bit nebulous.

Because of the substantial overlap in the cases, the Court consolidated Brown and Taylor for discovery, (Doc. No. 88) and trial (Doc. No. 116), with Brown designated as the lead case. Accordingly, references to "Plaintiffs" from here on will be a reference to the Plaintiffs in both cases, unless otherwise noted. Similarly, any reference to "Complaint" will be to the Amended Complaint

filed in <u>Brown</u>.  Finally, as a housekeeping matter, the Court notes that in response to Defendants'

Motion for Summary Judgment, Plaintiffs concede that Defendants are entitled to summary

judgment on Count I and IV.  Accordingly, the focus now is on Plaintiffs' claims that Defendants

were deliberately indifferent to the housing conditions at the Macon County Jail as alleged in Count

II, and that Plaintiffs were subject to unconstitutional conditions of confinement as alleged in Count

III.

The factual allegations underlying Plaintiffs' constitutional claims under Counts II and III

are set forth in the Complaint as follows:

> 51. Plaintiffs were forced to urinate in a milk jug that was provided to Plaintiffs by
> Defendant Doe and Defendant Summers;

> 52. Plaintiffs, having no access to the proper human waste receptacle and with no
> access to any sort of plumbing in which to rid their waste in (defecate), did so in trash
> bags, which were the only container they could utilize. The mental trauma associated
> with some of the post-traumatic stress disorder like symptoms was a direct and
> proximate cause from the humiliation suffered while being forced to use the
> bathroom in such conditions;

> 53. Plaintiffs had no hand washing abilities and had to ask to wash their hands
> sometimes being denied access for upwards of two to three (2-3) days at a time and
> resorted to beating on the door or covering the camera that monitored the Plaintiffs
> to get the attention of the guards that were watching in the tower;

> 54. Plaintiffs had no bed that lifted them off the floor;

> 55. Plaintiffs were given a pillow and a wool blanket along with a thin mat in which to
> sleep on the floor with;

> 56. Plaintiffs were housed with ten to fifteen (10-15) other men at any given time in
> the MPR room;

> 57. There was a room called the "ISO" room or isolation room that inmates were
> housed in similar to the "MPR" room;

> 58. The ISO room had no running water;

6

59. The ISO room had no human waste toilet;

60. Plaintiffs would defecate in a drain located in the middle of the room;

61. Plaintiffs would eat in this room while their waste was in the middle of the floor as [no one] would clean the area after Plaintiffs were forced to defecate in the drain[.]

(Am. Cmp. ¶¶ 51-61). As a result of having to endure these conditions, Plaintiffs claim that they suffered pain and mental distress.

At this point, of course, Plaintiffs' allegations are largely irrelevant because Defendants have filed a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure and the standards governing that rule guide this Court's analysis. These are the applicable principles: (1) summary judgment is only appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law, Fed. R. Civ. P. 56(a); (2) the facts and inferences must be construed in favor of the nonmoving party, Van Gorder v. Grand Trunk W. R.R., Inc., 509 F.3d 265, 268 (6th Cir. 2007); (3) the Court does not weigh the evidence, or judge the credibility of witnesses when ruling on the motion, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); and (4) the mere existence of a scintilla of evidence in support of the nonmoving party's position is insufficient to survive summary judgment, Rodgers v. Banks, 344 F.3d 587, 595 (6th Cir. 2003).

For obvious reasons, Defendants' focus in their Statement of Facts relate to the defenses they have raised, more specifically that many of Plaintiffs' claims are untimely; Plaintiffs' failed to exhaust their administrative remedies; and Defendants are entitled to qualified immunity.

In this vein, and ignoring facts relating to Plaintiffs' allegation surrounding medical care as alleged in Count I (which Plaintiffs concede should be dismissed) Defendants Statement of Facts and

Plaintiffs' responses thereto show the following:

• Defendants assert that the jail has a "kiosk system" from which inmates can purchase commissary items. The kiosk also contains the inmate handbook which contains a grievance policy. However, this fact is disputed based upon the deposition testimony of at least two Plaintiffs. Brown testified that there was no kiosk in the isolation room or MPS, nor were there any complaint or request forms in those areas of the jail. Reynolds testified that he only became aware of the kiosk when he was last arrested and placed in a pod with other inmates He also claims that the kiosk system was not introduced until September 2021. (SOF ¶¶ 18, 19).

• Defendants state that, "[a]t no time was Gammons made aware of any complaints, nor did he receive any complaints about any of the issues now raised by the plaintiffs in their complaint." (Declaration of Mark Gammons, ¶ 15). However, this, too, is disputed. Mann claims that, when inmates were complaining about the conditions in the MPR room, Gammons told them to "shut up." Similarly, Taylor testified that he complained to Gammons when Gammons was in the MPR room, but Gammons ignored him. (SOF ¶ 31).

•Defendants claim that Wilson was never made aware of, nor did he have reason to know, that inmates were not receiving regular bathroom breaks or allowed to take showers. However, at least one Plaintiff disputes this. Specifically, Mann claims that he pounded on and kicked the door requesting to use the bathroom but Wilson responded, "you keep kicking that door, but it ain't [sic] going to make me open it up no quicker. There's a hole in there you can sh[**] in. There's a milk jug you can piss in" while audibly laughing. (SOF ¶ 38 citing Mann Depo. at 147).

With respect to individual Defendants and their dates of incarceration, the Statement of Facts and response thereto show the following:

### Brown Case

Brown was incarcerated in the Macon County Jail from December 11, 2019 until March 13, 2020. (SOF ¶ 39).

Mullins was incarcerated from November 2, 2019 to June 29, 2020, and housed in the MPR from January 22, 2020 until February 21, 2020. While Defendants claim that Mullins did not have to urinate in a jug for the first few days he was incarcerated in the old visitation room, Mullins claims he had to do so from day one. Mullins concedes that he was told he would shower every few days and would be provided a bathroom break every few hours. The reality was otherwise according to Mullins, and it was worse on the night shift. According to him, inmates would knock on the

8

door requesting a bathroom break, but jailers would "get to it when they could." (Id. ¶¶ 40-43).

Harrison was incarcerated from December 19, 2019 to February 14, 2020. (Id. ¶ 44).

Tracy was incarcerated from November 21, 2018 to June 3, 2021. He was housed in the MPR on January 13 – 20, 2020; May 27, 2020 to June 1, 2020; and June 20 – 21, 2020. Defendants claim that Tracy filed a couple of grievances, one pertaining to an officer calling him names on May 26, 2020, and another one on December 28, 2020, about having to beg to use the restroom and wanting to move to a bigger cell. Tracy does not recall having discussion with Sutton about those matters. (Id. ¶¶ 45-48).

Mann was incarcerated from December 24, 2019 to February 14, 2020; June 11, 2020 to August 30, 2020; and September 5, 2020 to July 15, 2021. He was housed in the MPR for much of the period between the end of December 2019 and February 14, 2020. On January 21, 2020, Mann filled out an Inmate Request/Grievance form requesting to use a phone card because he could not use one while in the MPR room. A few days later, while in the shower line, Mann spoke with Sutton about his request and also stated that he needed more bathroom breaks and more frequent showers. In response, Sutton claims he prepared a shower schedule on January 23, 2020, hung it in the sergeant's room, and informed the staff of the need to rotate showers. (Id. ¶¶D 52-55).[5]

Gardner was incarcerated from December 4, 2019 to April 10, 2020. (Id. ¶ 55).

Rowe was incarcerated from August 3 – 6, 2020 and March 31, 2021 to February 18, 2022. At the time the Taylor case was filed, Rowe was still incarcerated and had not filed any grievance with regard to any of the issue alleged in the complaint. (Id. ¶¶ 58-60). He claims to have complained to a guard about use of bags for defecation in the MPR room, but the guard never registered it as a formal complaint. (Id. ¶ 60).

Feinstein was incarcerated from May 8, 2020 to May 1, 2021. He was housed in the MPR on May 13, 2020 and again on August 5 – 6, 2020. (Id. ¶ 63).

**Taylor Case**

Taylor was incarcerated from March 22, 2021 to July 29, 2021. He was placed in the isolation room from April 30, 2021 to May 1, 2021 and again from May 7 – 11, 2021.

---

[5] In their Statement of Facts, Defendants erroneously list this as happening in January 2023. However, Sutton's response to Mann's grievance wherein he stated that he was preparing a shower schedule is dated "1-23-20." (Doc. No 139-2 at 39, Sutton Dec. Ex. R).

9

He also claims to have spent a few hours in the MPR upon first arriving at the jail. While Defendants deny it, Taylor contends he wrote out complaints to Sutton and Wilson and attempted to speak with Gammons about the jail conditions. (Id. ¶ 65-67).

Loudy was incarcerated from February 26, 2021 to April 1, 2022. Like Taylor, he claims to have spent a few hours in the MPR, but Defendants deny it. (Id. ¶¶ 68-69).

Griffin was incarcerated from November 22, 2019 to April 1, 2020. (Id. ¶ 70).

Reynolds was incarcerated from February 17, 2021 to at least October 6, 2021, but was never housed in the MPR. He filed several grievances, none of which, apparently, were related to the living conditions in the jail. (Id. ¶¶ 71, 72).

Fisher was incarcerated from September 8, 2020 to December 7, 2020. He was housed in the MPR on several occasions: November 6 – November 7; November 9 – 19, 2020; and November 27, 2020 to December 1, 2020. Defendants claim Fisher made no complaints about his conditions of confinement, but Fisher claims he made plenty of complaints. He acknowledges receiving the opportunity to shower every other day. (Id. ¶¶ 75-78).

Guffey was incarcerated from January 22 – 27, 2021 and held in the MPR room for almost this entire period. (Id. ¶¶ 80, 81).

Berg was incarcerated from January 14, 2020 to February 28, 2020. (Id. ¶ 82).

Tankesly was incarcerated from October 12, 2020 to November 10, 2020 and from January 28, 2021 to July 6, 2022. He was housed in the MPR from March 4, 2021 to March 6, 2021; April 2 – 4, 2021; and on July 14, 2021. He may also have been housed there for a period in October 2020. While Defendants contend Tankesly never complained, he claims to have complained repeatedly. (Id. ¶¶ 83-85).

Based on these facts,[6] the Court turns to the pending motions.

## II. Motions for Summary Judgment

As noted, Plaintiffs remaining claims are brought pursuant to 42 U.S.C. § 1983. That statute

---

[6] It appears that while some inmates may not have been housed in the MPR, they may have been housed elsewhere (such as in the ISO) that had the same issues with lack of running water and bathroom facilities.

"provides a civil enforcement mechanism for all inmates who suffer constitutional injuries at the hands of '[a]ny person acting under color of state law.'" Ford v. Cnty. of Grand Traverse, 535 F.3d 483, 494 (6th Cir. 2008) (quoting 42 U.S.C. § 1983). Accordingly, to survive summary judgment, a plaintiff must demonstrate a genuine issue of material fact "that a person acting under color of state law deprived him of a right secured by the Constitution or laws of the United States." Green v. Throckmorton, 681 F.3d 853, 859–60 (6th Cir. 2012). And, as will be demonstrated below, a plaintiff must also show that he filed suit in a timely fashion, that he exhausted his available administrative remedies, and that there is sufficient evidence to hold a particular defendant liable.

**A. Statute of Limitations**

"The statute of limitations applicable to a § 1983 action is the state statute of limitations applicable to personal injury actions under the law of the state in which the § 1983 claim arises." Eidson v. State of Tennessee Dep't of Children's Servs., 510 F.3d 631, 634 (6th Cir. 2007) (citing Kuhnle Bros., Inc. v. County of Geauga, 103 F.3d 516, 519 (6th Cir.1997)). In Tennessee, this limitation period is one year based on Tennessee Code Annotated § 28–3–104(a). Howell v. Farris, 655 F. App'x 349, 351 (6th Cir. 2016) (citing Hughes v. Vanderbilt Univ., 215 F.3d 543, 547 (6th Cir. 2000)).

Defendants argue they are entitled to summary judgment with respect to all of the Brown Plaintiffs because they complain of events that occurred between January and late February 2020, but the Amended Complaint was not filed until more than a year later on May 7, 2021. To get around this bar, Plaintiffs assert that the Amended Complaint relates back to the time of the original filing of the *pro se* complaint by Brown on February 26, 2021, which was within the one-year limitations period. Alternatively, Plaintiffs argue that their claims are subject to the continuing

11

violations doctrine and the discovery rule. The Court is unpersuaded by any of Plaintiffs' arguments.

In their brief, Plaintiffs cite and rely on state law and Tennessee Civil Procedure Rule 15 in arguing that the Amended Complaint relates back to the original *pro se* filing. However, "the question of whether an amendment relates back to the date of the original complaint is a question of federal procedure not controlled by state law even in a diversity case." Simmons v. S. Cent. Skyworker's, Inc., 936 F.2d 268, 270 (6th Cir. 1991); accord Am. Annuity Grp. v. Guar. Reassurance Corp. Liquidating Tr., 55 F. App'x 255, 256 (6th Cir. 2003).

Rule 15(c) of the Federal Rules of Civil Procedure governs relation back in federal cases by providing in pertinent part:

> (1) When an Amendment Relates Back. An amendment to a pleading relates back to the date of the original pleading when:
>
> > (A) the law that provides the applicable statute of limitations allows relation back;
> >
> > (B) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading; or
> >
> > (C) the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:
> >
> > > (i) received such notice of the action that it will not be prejudiced in defending on the merits; and
> > >
> > > (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

Fed. R. Civ. P. 15(c). At issue here is subsection (C), and the analysis is controlled by the Sixth Circuit decision in Asher v. Unarco Material Handling, Inc., 596 F.3d 313, 318 (6th Cir.2010).

12

<u>Asher</u> was a case of "first impression in [the Sixth] Circuit," and, like here, presented "the question of whether Rule 15(c) permits relation back of an amendment adding otherwise untimely plaintiffs and their claims to a timely-filed complaint." <u>Id.</u> at 317. After noting that "the precedent of this circuit clearly holds that 'an amendment which adds a new party creates a new cause of action and there is no relation back to the original filing for purposes of limitations,'" <u>id.</u>, (quoting <u>In re Kent Holland Die Casting & Plating, Inc.</u>, 928 F.2d 1448, 1449 (6th Cir.1991)), the Sixth Circuit went on to hold:

> Although the new plaintiffs are correct that our prior decisions applying this rule involved plaintiffs' attempts to add defendants after the statute of limitations expired, they offer no authority or persuasive justification for treating plaintiffs differently from defendants and allowing untimely plaintiffs to ride piggyback on the claims of timely plaintiffs. Indeed, the plain language of Rule 15(c) does not authorize the exception advanced by the new plaintiffs.
>
> Rule 15(c)(1)(B) allows relation back of an amendment asserting a "claim or defense," but it does not authorize the relation back of an amendment adding a new party. Similarly, Rule 15(c)(1)(C) permitting relation back of an amendment changing a party or its name applies, by its plain language, to changes to defendants. . . . Although various courts have extended the relation-back provisions of Rule 15(c)(1)(C) to amendments changing identities of plaintiffs, the type of "changes" permitted are limited to corrections of misnomers or misdescriptions.

<u>Id.</u> at 318 (internal citations omitted).

As in <u>Asher</u>, Plaintiffs do "not seek to correct a misnomer or misdescription of a proper party plaintiff already in court, nor d[o] they attempt 'to change the capacity in which [they] sue[d]; or to substitute or add as plaintiff[s] the real party interest; or to add additional plaintiffs where the action, as originally brought, was a class action.'" <u>Id.</u> (citation omitted). Instead, and also as in <u>Asher</u>, "they attempted to circumvent the statute of limitations, adding new parties and new claims." <u>Id.</u> at 319. This they cannot do under controlling Sixth Circuit precedent.

13

Nor does Sixth Circuit authority support their continuing violation theory. "This Circuit employs the continuing violations doctrine most commonly in Title VII cases, and rarely extends it to § 1983 actions." Sharpe v. Cureton, 319 F.3d 259, 267 (6th Cir. 2003) (citing LRL Properties v. Portage Metro Hous. Auth., 55 F.3d 1097, 1106 n. 3 (6th Cir.1995)). "For a continuing violation to exist: (1) 'the defendant's wrongful conduct must continue after the precipitating event that began the pattern,' (2) 'injury to the plaintiff must continue to accrue after that event,' and (3) 'further injury to the plaintiffs must have been avoidable if the defendants had at any time ceased their wrongful conduct.'" Norman v. Granson, No. 18-4232, 2020 WL 3240900, at *2 (6th Cir. Mar. 25, 2020) (quoting Tolbert v. Ohio Dep't of Trans., 172 F.3d 934, 940 (6th Cir. 1999). Thus, "[a] continuing violation occurs over several incidents that are not themselves actionable; conversely, discrete events that are easily identifiable and separately actionable do not constitute a continuing violation. Id. (citing Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 114-15 (2002)). Further, a continuing violation cannot be based upon "the continual ill effects from an original violation." Eidson v. Tenn. Dep't of Children's Servs., 510 F.3d 631, 635 (6th Cir. 2007).

Here, Plaintiffs' complaints involve discrete acts. Take for instance, their most viable claim – having to utilize a jug or a plastic bag to relieve themselves. Each time they had to do so was a separate act. See, Wallace v. Coffee Cnty., No. 4:18-CV-25, 2020 WL 2946064, at *5 (E.D. Tenn. June 3, 2020) (stating that "each denial of Plaintiff's requests for cleaning supplies, clean bed sheets, or showers were discrete, allegedly unconstitutional, actions on the part of the corrections officers"). Plaintiffs cites no Sixth Circuit authority applying the continuing violations to a Section 1983 claim and the Court has found none based upon facts even remotely similar to those presented here.

Plaintiffs next attempt to avoid the statute of limitations bar based upon the discovery rule.

14

Again, Plaintiff points to Tennessee law in making this argument. However, even though state law governs the limitations period in Section 1983 cases, when that claim accrues "is a question of federal law, . . . conforming in general to common-law tort principles." Wallace v. Kato, 549 U.S. 384, 388 (2007).

"The discovery rule recognizes that, without certain information, a plaintiff has no viable claim." Snyder-Hill v. Ohio State Univ., 48 F.4th 686, 699 (6th Cir. 2022). "'That he has been injured in fact may be unknown or unknowable until the injury manifests itself; and the facts about causation may be in the control of the putative defendant, unavailable to the plaintiff or at least very difficult to obtain.'" Id. (quoting United States v. Kubrick, 444 U.S. 111, 122 (1979)). Even though the Sixth Circuit has occasionally applied the discovery rule to § 1983 claims in the past, it has recently questioned whether "our cases imbibing this 'bad wine' warrant reconsideration in light of the Supreme Court's recent teachings." Dibrell v. City of Knoxville, 984 F.3d 1156, 1162 (6th Cir. 2021). Regardless, Plaintiffs cannot avail themselves of the discovery rule.

It is true, as Plaintiffs argue, that a complaint by an inmate about not being allowed a shower or not being provided a bed on one or a two occasions "is not enough to give rise to a showing of a constitutional right of deliberate indifference." (Doc. No. 146 at 11). However, "[t]he general federal rule is that 'the statute of limitations begins to run when the reasonable person knows, or in the exercise of due diligence should have known, both his injury and the cause of that injury.'" Bishop v. Child.'s Ctr. for Developmental Enrichment, 618 F.3d 533, 536 (6th Cir. 2010) (quoting Campbell v. Grand Trunk W. R.R. Co., 238 F.3d 772, 775 (6th Cir. 2001)). "[T]he discovery rule does not delay the accrual of a cause of action and the commencement of the statute of limitations until the plaintiff knows the full extent of the damages," or "until the plaintiff knows the specific

15

type of legal claim it has," because the "rule is not intended to permit a plaintiff to delay filing suit until the discovery of all the facts that affect the merits of his or her claim."  Smith v. Hilliard, 578 F. App'x 556, 563 (6th Cir. 2014) (internal citations omitted).  Indeed, "[w]ere it otherwise, the statute would begin to run only after a plaintiff became satisfied that he had been harmed enough, placing the supposed statute of repose in the sole hands of the party seeking relief."  Wallace v. Kato, 549 U.S. 384, 391 (2007).  That is exactly what Plaintiffs attempt to do by way of this argument.

Based on all of the foregoing, this Court agrees with Defendants that the statute of limitations bars the Section 1983 claims brought by each Plaintiff in the Brown case, albeit with one exception.  Brown filed suit on February 26, 2021, within one year of the period alleged in the Amended Complaint and within a year of his release from the Macon County Jail.  True, he did not sue the present Defendants, but he did sue the Sheriff's Department.

Brown's situation is substantially similar to that presented to the Sixth Circuit in Black-Hosang v. Ohio Dep't of Pub. Safety, 96 F. App'x 372 (6th Cir. 2004).  There, plaintiff sued the Ohio Department of Public Safety (of which the Ohio State Highway Patrol was a part) for false arrest, but did not name or sue the arresting state trooper until she filed an amended complaint.  Because an amended complaint naming the trooper was not filed until after the statute of limitations had run, the district court found that relation back under Rule 15(c) did not apply to the new defendant.  Rejecting that argument, the Sixth Circuit conceded that the language in Rule 15(c) about a "mistake concerning the identity of the proper party" could be deemed "ambiguous" but "the Advisory Committee Notes to Rule 15(c) make it clear that Black-Hosang's naming of an immune governmental entity as the defendant is exactly the sort of mistake contemplated by the drafters of this provision in 1966."  Id. at 376.  Likewise here, the Court finds that Brown's naming of a non-

16

suable governmental agency constitutes a mistake within the meaning of Rule 15(c)(3).

In addition to Mullins, Harrison, Tracy, Mann, Gardner, Rowe, and Feinstein from the <u>Brown</u> case, the Court will also dismiss Griffin and Berg from the <u>Taylor</u> case based upon the statute of limitations. This is because Griffin was released from the Macon County Jail on May 1, 2020, and Berg was released on February 28, 2020. However, the <u>Taylor</u> case was not filed until October 6, 2021 and so their claims are beyond the one-year statute of limitations in Tennessee for personal injuries.[7]

Finally, the Court will dismiss the claims against Summers on statute of limitations grounds and grant her motion for summary judgment on that basis, just as it did in the <u>Taylor</u> case before the cases were consolidated. (Case No. 3:21-cv-00040. Doc. No. 94). This is because Taylor left her employment at the Macon County Jail on April 16, 2020, but suit naming her was not filed until May 7, 2021. In reaching this conclusion, the Court is not ignoring its previous ruling regarding Brown and the remaining Defendants based upon <u>Black-Hosang</u>. However, as that case also teaches, while Rule 15(c)(3) permits some mistakes as to the naming of a defendant, it also requires "that, *within 120 days from the filing of the original complaint*, the new party must have known, or should have

---

[7] The Court rejects efforts to dismiss other Defendants from the <u>Taylor</u> case because they would have been aware of the conditions about which they now complain as soon as they arrived at the jail but did not file suit until more than a year later. This argument ignores that each constitutional violation is a separate act starting the statute of limitations period anew. <u>See</u> <u>Epcon Homestead, LLC v. Town of Chapel Hill</u>, 62 F.4th 882, 890 (4th Cir. 2023) (citation omitted) ("[I]f the alleged constitutional violation occurs 'in a series of separate acts and if the same alleged violation was committed at the time of each act, then the limitations period begins anew with each violation."; <u>Hutt v. Liberty Healthcare Corp.</u>, No. 15-CV-3094-JES, 2017 WL 11501507, at *5 (C.D. Ill. Dec. 13, 2017) ("[E]very week that Defendant allegedly caused Plaintiff to receive inadequate treatment marked a fresh infliction of a constitutional violation that caused the statute of limitations to start running anew.").

known, that he or she would have been sued but for the mistaken pleading." 96 F. App'x at 377 (emphasis in original). That was hardly the case here. Unlike the Sheriff, the Jail Administrator, and the Assistant Jailer Administrator, Summers left her job before the original complaint was filed and thus, the Court cannot say she "should have known" of its existence.

## B. Exhaustion of Administrative Remedies

Next, Defendants argue that a number of individuals, including Rowe, Loudy and Reynolds, should be dismissed pursuant to the Prison Litigation Reform Act ("PLRA") because they failed to exhaust administrative remedies. That Act provides, in pertinent part: "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C.A. § 1997e.

Exhaustion of administrative remedies is mandatory, Porter v. Nussle, 534 U.S. 516, 524 (2002), and the failure to exhaust those remedies is an affirmative defense that must be established by a defendant, Jones v. Bock, 549 U.S. 199, 216 (2007). "[I]t is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." Id., 549 U.S. at 218. "[E]xhaustion is required even if the prisoner subjectively believes the remedy is not available; even when the state cannot grant the particular relief requested; and 'even where [the prisoners] believe the procedure to be ineffectual or futile[.]'" Napier v. Laurel Cty., 636 F.3d 218, 222 (6th Cir. 2011) (internal citations omitted). Thus, "an inmate cannot simply fail to file a grievance or abandon the process before completion and claim that he has exhausted his remedies or that it is futile for him to do so because his grievance is now time-barred under the regulations." Hartsfield v. Vidor, 199 F.3d 305, 309 (6th Cir. 1999).

On the other hand, "exhaustion is not required 'when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation.'" Does 8-10 v. Snyder, 945 F.3d 951, 963 (6th Cir. 2019) (quoting Ross v. Blake, 578 U.S. 632, 644 n.3 (2016). ). "In particular, this exception applies when prison officials prevent the[] use of otherwise proper procedures,' or design a process that can 'trip[ ] up all but the most skillful prisoners.'" Id. (quoting Woodford v. Ngo, 548 U.S. 81, 102 (2006)). "If a remedy is administered or designed in this way, then inmates need not exhaust." Id. This is hardly surprising because the PLRA requires only the exhaustion of *available* administrative remedies.

Whether a remedy is actually available or not can be a question of fact precluding summary judgment. See, Lamb v. Kendrick, 52 F.4th 286, 294 (6th Cir. 2022); Holbrook v. Boyd Cnty., 434 F. App'x 472, 474 (6th Cir. 2011). Such is the case here.

In the argument section of their brief, Defendants discuss the law surrounding exhaustion and then conclusorily assert that several Plaintiffs failed to exhaust Macon County's administrative remedies without identifying those remedies or the procedure for invoking those remedies. Elsewhere, the brief speaks about inmates being "advised of the procedures to file an inmate request and inmate grievance" and then notes that inmates are to use a kiosk to read the inmate handbook and grievance policy and, from the kiosk, request grievance forms. (Doc. No. 137 at 6). This argument, however, ignores the assertion by many Plaintiffs that kiosks were not in the MPR or ISO and therefore there was no access to them. It also ignores the argument that the placing of kiosks in the jail is of relatively recent vintage. And it ignores other Plaintiffs' entreaties to guards to file

19

grievances on their behalf, but those request, were ignored.[8]  Of course, Defendants may be able to "present evidence showing that the plaintiff's ability to exhaust was not hindered," Surles v. Andison, 678 F.3d 452, 458 (6th Cir. 2012), but the time for doing so will be at trial.

## C. Qualified Immunity

Next, the individual Defendants insist they are entitled to qualified immunity.  The qualified immunity doctrine shields government officials from civil liability unless they violate a person's clearly established rights.  Kisela v. Hughes, 138 S. Ct. 1148, 1152 (2018).  The doctrine is intended to "'balance[ ] two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.'" Richko v. Wayne Cnty., 819 F.3d 907, 914 (6th Cir. 2016) (quoting Pearson v. Callahan, 555 U.S. 223, 231 (2009)).

"[A] defendant is entitled to qualified immunity on summary judgment unless the facts, when viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that: (1) the defendant violated a constitutional right; and (2) the right was clearly established." Bishop v. Hackel, 636 F.3d 757, 765 (6th Cir. 2011) A legal principle is clearly established if there is then-existing precedent "clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." District of Columbia v. Wesby, 138 S. Ct. 577, 589–90 (2018).  When a defendant invokes qualified immunity and carries his or her initial summary judgment burden, "the plaintiff bears the burden to show that qualified immunity is inappropriate." Quigley, 707 F.3d at 681.  In the absence of a clear constitutional violation, the decision as to

---

[8]  The Court recognizes that asking guards to file a grievance likely does not comply with the handbook.  Then again, if inmates did not have ready access to a handbook, they cannot be charged with knowing what it says.

whether existing legal authority has placed the statutory or constitutional question beyond debate is determined by looking first to Supreme Court precedent, then to Sixth Circuit precedent, and then to decisions of other courts of appeal. Barber v. Miller, 809 F.3d 840, 845 (6th Cir. 2015); Flint v. Kentucky Dep't of Corr., 270 F.3d 340, 347 (6th Cir. 2001).

With respect to Counts II and III, Defendants argue that "Plaintiffs fail to specifically allege that these Defendants [Gammons, Sutton and Wilson] were aware of a substantial risk of harm and ignored the risk and they cannot establish that any of the individual defendants in this case had the requisite state of mind to be deliberately indifferent to a serious omission." (Doc. No. 28 at 28). Defendants also argue that "[t]here is no evidence that these individuals participated in the denial of restroom breaks or showers to Plaintiffs" and, "as such there is no clearly establish law creating liability as to these Defendants." (Id. at 30-31). The Court agrees, but only to a point.

Being deprived of a mattress for a short period, not allowing an inmate to shower for a few days, and only providing bathroom breaks at regularly scheduled times, may not rise to the level of a constitutional deprivation. See, Dellis v. Corr. Corp. of Am., 257 F.3d 508, 511 (6th Cir.2001) (holding that temporarily being deprived of a working toilet "did not demonstrate that the conditions fell beneath the minimal civilized measure of life's necessities as measured by a contemporary standard of decency"); Hartsfield v. Vidor, 199 F.3d 305, 309–10 (6th Cir.1999) (noting "that deprivations of fresh water and access to the toilet for a [twenty]-hour period, while harsh, were not cruel and unusual"); Bodman v. Dennis, No. 14-1316, 2015 WL 13927074, at *2 (6th Cir. Mar. 31, 2015) (holding that being "required to sleep on a pallet on the floor and not allowed a shower for eight days" is not cruel and unusual punishment); Richmond v. Settles, 450 F. App'x 448, 455 (6th Cir. 2011) (collecting authority for the proposition that being deprived of a shower and other

personal hygiene items for a "brief span of time . . ., i.e., only six days" and being deprived of a mattress and bedding for up to 30 days was not a constitutional violation).

On the other hand, the Supreme Court has made "clear that officials can still be on notice that their conduct violates established law even in novel factual circumstances." Hope v. Pelzer, 536 U.S. 730, 741 (2002). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier v. Katz, 533 U.S. 194, 202 (2001).

Hopefully, requiring inmates to urinate in a jug and defecate in a bag for days on end is novel. Indeed, the Court has found no cases addressing the situation. However, it cannot be seriously disputed that requiring inmates to relieve themselves in that fashion is cruel and unusual punishment because it is contrary to "the evolving standards of decency that mark the progress of a maturing society." Graham v. Florida, 560 U.S. 48, 58 (2010). It is for this reason, perhaps, that Defendants do not address this particular issue in their brief.

As for Defendants' assertion that they did not act with the requisite state of mind and were not deliberately indifferent, that presents a factual issue on this record. Morgan by next friend Morgan v. Wayne Cnty., 33 F.4th 320, 327 (6th Cir. 2022) (citation omitted) ("Whether a prison official had the requisite knowledge of a substantial risk is a question of fact[.]"). "For example, the factfinder 'may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" Atkins v. Crowell, 945 F.3d 476, 480 (6th Cir. 2019) (citation omitted). Such may be the case here.

In reaching the foregoing conclusion, the Court recognizes that "Section 1983 will not support a claim based on a respondeat superior theory of liability." Polk Cnty. v. Dodson, 454 U.S.

22

312, 325 (1981).  Rather, "[t]o state a claim of supervisory liability under § 1983, plaintiffs must plausibly allege that a defendant 'authorized, approved, or knowingly acquiesced in the unconstitutional conduct . . . of his subordinates through the execution of his job functions.'" Does v. Whitmer, 69 F.4th 300, 306 (6th Cir. 2023) (quoting Crawford v. Tilley, 15 F.4th 752, 761 (6th Cir. 2021)).  While "[s]loppiness, recklessness, or negligence is insufficient to establish liability, . . . deliberate indifference, knowing acquiescence, tacit or implicit authorization, or failure to take precautions against likely violations may suffice." Id. (citing, Garza v. Lansing Sch. Dist., 972 F.3d 853, 866 (6th Cir. 2020); Gardner v. Evans, 920 F.3d 1038, 1051 (6th Cir. 2019)).

Here, when the facts are construed in Plaintiffs' favor as they must be for present purposes, each of Defendants did not act with a reckless or negligent state of mind.  Rather, each was well aware of the conditions in the MPR and ISO, but chose to go along with the practice of requiring inmates to urinate in jugs and defecate in plastic bags.  Indeed, the Jail Administrator allegedly found it funny, and the Sheriff told the complaining inmates to "shut up."  (SOF ¶¶ 31, 38).  Factual issues preclude granting qualified immunity at this time.

## D.  Macon County Liability

Under Section 1983, a governmental entity such as a city or county is a "person" and can only be held liable for its own wrongdoing and not under a theory of *respondeat superior*." Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 690 (1978).  To hold a governmental entity like Macon County liable, Plaintiffs must show that their constitutional rights were violated because of a "policy or custom" of the county.  Id. at 694.

"A municipality may be held liable under one of four recognized theories: '(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making

authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations.'" Morgan by next friend Morgan v. Wayne Cnty., 33 F.4th 320, 328 (6th Cir. 2022) (quoting Burgess v. Fischer, 735 F.3d 462, 478 (6th Cir. 2013)). Here, Plaintiffs have presented a triable claim against Macon County on at least a couple of those theories.

"'[I]n Tennessee, the Sheriff has the 'custody and charge' of the County Jail and all prisoners committed thereto[.]'" Shorts v. Bartholomew, 255 F. App'x 46, 57 (6th Cir. 2007) (quoting Marchese v. Lucas, 758 F.2d 181, 188 (6th Cir. 1985)); see also Miller v. Calhoun Cnty., 408 F.3d 803, 814 (6th Cir. 2005) (noting that there was no dispute that the Sheriff, under Tennessee law, final policymaking authority over the county jail).[9] It follows, therefore, that a policy attributable to the county can be found where there are "numerous similar incidents" and the Sheriff fails to supervise and correct the situation and punish those responsible. Id.

If a jury believes Plaintiffs, there is more than enough evidence to suggest a policy for which Macon County is liable. According to Plaintiffs, up to a dozen or more men were locked in the MPR or ISO for days on end and not allowed to use the bathroom. Not only was the Sheriff aware of this practice, when Plaintiffs complained to the Sheriff and his top jail administrators their complaints were ignored.

To be sure, Defendants paint a different picture and claim that the actual policy was to allow bathroom breaks and regular showers. However, because a jury could find that this "policy" was honored more in its breach than its observance, Macon County will not be dismissed as a Defendant

---

[9] By statute, a Tennessee county Sheriff is obligated to "[t]ake charge and custody of the jail of the sheriff's county, and of the prisoners therein[.]" Tenn. Code Ann. § 8-8-201.

in this action.

### III.  Motion to Amend Case Management Order and Reconsider Motion to Amend

On October 4, 2023, this Court entered an Order that provided:

> Without any explanation or justification, Plaintiffs' have filed a Motion for Leave to Amend the First Amended Complaint (Doc. No. 159). The motion is DENIED. The deadline to amend was February 11, 2022 (Doc. No. 65). Additionally, there [a]re two fully briefed motions for summary judgment pending. (Doc. No. 117 and 165). Plaintiffs' motion to amend offers no basis for why their motion to amend would be proper.

(Doc. No. 163 at 1).  Undeterred by this Order and the existence of fully briefed Motions for Summary Judgment, Plaintiffs, on October 20, 2023,  filed a Motion to Amend Case Management Order and Reconsider Motion to Amend.  (Doc. No. 167).  Plaintiffs' present motion is more substantial than before, covering as it does more than 10-pages.  It is no more persuasive, however.

Plaintiffs begin their substantive discussion by stating that "all parties and this Honorable Court have been playmaking like the December 12, 2023, trial date is not only reasonable but inevitable.  It is time for all involved to acknowledge that this is a legal fiction."  (Id. at 4).  Plaintiffs also argue that the trial date is not going to happen because, "[r]ight now, two months from the supposed trial date, there is still an[]outstanding motion for summary judgment"– (actually two) – and the possibility that Defendants will take an interlocutory appeal which would, "in and of itself, . . . render the current December date irrelevant."  (Id.).  Plaintiffs continue:

> Finally, there is the issue of the Court having to marshal the Plaintiffs who are currently incarcerated across multiple prisons in multiple states.  This Court will ... need to designate what facility the incarcerated Plaintiffs will be housed in. . . . [T]he trial as currently scheduled for the middle of the holiday season [will] cause stress from a staffing perspective, especially considering the amount of coordination necessary.  While obviously some trials need to be scheduled for these time, there are special considerations in the context of the logistical issues a case such as this brings up.  A delay will significantly reduce the burden and support the concept of judicial

25

economy.

(Id. at 5).  Because of all of this, Plaintiffs propose extending the dispositive motion "deadline to December 15, 2023, the amendment deadline to November 15, 2023, and the trial date to a time in late February or March" 2024.  (Id. at 6).

Frankly, the Court is amazed at the presumptuousness of Plaintiffs' counsel.  While the Court may enjoy reading fiction now and again, it does not dabble in that genre when setting trial dates. The notion that the Court cannot empanel a 6-8 member civil jury in mid-December for a trial that Plaintiffs submit will likely last "multi-weeks" does not (1) account for the reality that the number of Plaintiffs has now been more than halved; or (2) take into consideration this Court was able to seat a 20 person criminal jury (12 regular and 8 alternate jurors) last Fall for a case involving seven defendants that was expected to last four months and conclude sometime shortly before Christmas.

Plaintiffs' apparent belief that they will be in attendance throughout the trial ignores the well-settled precedent that "[n]either the Fifth Amendment's due process clause nor the Seventh Amendment's guarantee of a jury trial grants to a civil litigant the absolute right to be present personally during the trial of his case."  Helminski v. Ayerst Lab'ys, a Div. of Am. Home Prod. Corp., 766 F.2d 208, 213 (6th Cir. 1985).  Instead, and "[c]onsistent with due process[,] the right to be present may be sufficiently protected in the party's absence so long as the litigant is represented by counsel."  Id. at 214.

This is not to say that a "court may . . . exclude arbitrarily a party who desires to be present merely because he is represented by counsel[.]"  Id.  It is to say, however, that "[i]n order to determine whether the prisoner should appear at trial, the district court must consider factors such as 'whether the prisoner's presence will substantially further the resolution of the case, the security

26

risks presented by the prisoner's presence, the expense of the prisoner's transportation and safekeeping, and whether the suit can be stayed until the prisoner is released without prejudice to the cause asserted.'" Latiolais v. Whitley, 93 F.3d 205, 208 (5th Cir. 1996) (citation omitted); see also Jones v. Hamelman, 869 F.2d 1023, 1030 (7th Cir. 1989) ("[I]t is within the discretion of the court to determine whether a prison inmate shall attend court proceedings held in connection with an action initiated by the inmate. The discretion is not unfettered or unbridled, however.") In short, "[a]lthough there is a constitutional right of 'access to the courts,' that right is satisfied by an 'opportunity to consult with counsel and to present his case to the court,' which typically can be accomplished even when the litigant is not physically present at the courthouse," and, thus, the "right to access does not necessarily mean the right to be physically present at the trial of a civil suit." Davidson v. Desai, 964 F.3d 122, 129 (2d Cir. 2020).

Additionally, and unlike counsel, the Court does not presume that Defendants will take an interlocutory appeal. Any such appeal would be based upon the denial of qualified immunity. However, as the Sixth Circuit has made painstakingly clear, such interlocutory appeals are "limited to legal questions because 'circuit courts can review a denial of qualified immunity only 'to the extent that it turns on an issue of law.'" Raimey v. City of Niles, 77 F.4th 441, 447 (6th Cir. 2023) (quoting Brown v. Chapman, 814 F.3d 436, 444 (6th Cir. 2016)). The Court does not believe that allegedly having to communally live in a cell day-in-day-out without bathroom facilities qualifies.

Elsewhere in their brief, Plaintiffs' submit that, "[a]s to prejudice, in a practical sense, there simply is none." (Doc. No. 167 at 11). They argue that "all changes made to the [proposed Second Amended Complaint] are based off deposition testimony *they [defendants] conducted"* and, therefore, "[t]hey had just as much, if not more, time than Plaintiffs to review the transcripts for

potential changes to the Complaint."  (Id.) (italics in original).  "Finally, as to good faith," Plaintiffs assert that they "worked diligently and in good faith," and bemoan that (1) discovery was not completed  "until nearly a year after the amendment deadline passed"; and (2) they "had to digest the significant volume of discovery" while dealing with other matters (such as formal mediation) before they were in a position to amend the complaint.  (Id. at 12).

Rule 15 of the Federal Rules of Civil Procedure provides that "[t]he court should freely give leave" to amend a pleading "when justice so requires."  Fed. R. Civ. P. 15(a)(2).  However, in this case, that rule must be read in conjunction with Rule 16 which provides that, when a scheduling order has been entered that includes a deadline for amendment of pleadings, that order can be modified  "only for good cause." Fed. R. Civ. P. 16(b)(4).  "Consequently, notwithstanding Rule 15's directive freely to give leave to amend, a party seeking leave to amend after the scheduling order's deadline must meet Rule 16's good-cause standard in order for the district court to amend the scheduling order." Carrizo LLC v. City of Girard, 661 F. App'x 364, 367 (6th Cir. 2016) (citing Leary v. Daeschner, 349 F.3d 888, 904 (6th Cir. 2003)).

"Parties can demonstrate 'good cause' for their failure to comply with the original schedule, by showing that despite their diligence they could not meet the original deadline."  Id.  Plaintiffs have not done so.  "Another relevant consideration is possible prejudice to the party opposing the modification."  Inge v. Rock Fin. Corp., 281 F.3d 613, 625 (6th Cir. 2002).  There is plenty of possible prejudice to Defendants.

The proposed Second Amended Complaint contains 76-numbered paragraphs, of which 34 are new or revised.  Most strikingly, the amendment eliminates the references to  "in and around January 2020 until February 2020" for each of the Brown Plaintiffs and substitutes incarceration

dates for them.

Certainly Plaintiffs knew, or should have known, the general time frame during which they were housed in the Macon County Jail within the past couple of years. For whatever reason, however, Plaintiffs, "who are the masters of their complaints," Standard Fire Ins. Co. v. Knowles, 568 U.S. 588, 595 (2013), chose to limit their claim to the January-February 2020 time frame in their Complaint and Defendants defended on that basis. It would defy reality to say that Defendants would not be prejudiced by this change, particularly because the change only came about after Defendants fully-briefed their two motions for summary judgment. Litigants can sometimes change horses midstream, but they cannot – without good cause after a scheduling order – change to a horse that is more than a furlong ahead and about to cross the finish line.

## IV. Conclusion

On the basis of the foregoing, Kim Summers' Motion for Summary Judgment (Doc. No. 117) will be granted. The Motion for Summary Judgment filed by the remaining Defendants (Doc. No. 136) will be granted solely with respect to the claims brought by Mullins, Harrison, Tracy, Mann, Gardner, Roe, Feinstein, Griffin, and Berg. Plaintiffs' Motion for Oral Argument (Doc. No. 155) and Motion to Amend Case Management Order and Reconsider Motion to Amend (Doc. No. 167) will be denied.

An appropriate Order will be entered.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE